UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| S.F., <br><br>             Petitioner, <br><br> v. <br><br> DREW BOSTOCK, Seattle Field Office Director, U.S. Immigration and Customs Enforcement and Removal Operation ("ICE/ERO"); KRISTI NOEM, Secretary of Homeland Security; PAMELA BONDI, Attorney General of the United States; TODD LYONS, Acting Director of Immigration and Customs Enforcement ("ICE"); U.S. DEPARTMENT OF HOMELAND SECURITY, <br><br>             Respondents, | Case No. 3:25-cv-01084-MTK <br><br> **OPINION & ORDER** |

**KASUBHAI,** United States District Judge:

Before the Court is Petitioner S.F.'s Petition for Writ of Habeas Corpus, ECF No. 1. For the following reasons, the petition is GRANTED.

## BACKGROUND

The Court finds the following facts to be true and without credible dispute. Petitioner S.F. ("Petitioner") is a citizen of Iran who entered the United States on or about August 6, 1999. Hammer Decl. ¶ 4, ECF No. 10. Upon arrival, Petitioner received a B-2 visitor visa, which he

Page 1 — OPINION & ORDER

overstayed. Hammer Decl. ¶ 4. Petitioner has lived in the United States for over twenty-five years. Hammer Decl. ¶ 4. Petitioner lives with his wife and two young children, all three of whom are U.S. citizens, and his mother, an Iranian national to whom the United States granted asylum in 2024. Evidentiary Hr'g Tr. ("Evid. Tr.") 24:6-21, ECF No. 26. On June 24, 2025, as Petitioner was driving to the gym from his home, U.S. Immigration and Customs Enforcement ("ICE") pulled him over, arrested him, and transported him to the ICE facility in Portland, Oregon. Decl. Supp. Mot. TRO ("Purcell Decl. I") ¶¶ 2-3, ECF No. 4. ICE then transported Petitioner to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington, where he remains detained. Hammer Decl. ¶ 16.

I.      **History of Petitioner's Release and Supervision**

On October 12, 2000, the Department of Homeland Security filed a Notice to Appear, charging Petitioner with removal for overstaying his B-2 visitor visa. Hammer Decl. ¶ 5. In June 2002, an immigration judge denied Petitioner's requests for removal relief and asylum. Hammer Decl. ¶ 6. In 2004, the Board of Immigration Appeals ("BIA") dismissed Petitioner's appeal of the immigration judge's decision. Hammer Decl. ¶ 7. Petitioner was taken into ICE custody on a final order of removal on December 7, 2005. Hammer Decl. ¶ 8. However, ICE released Petitioner on an Order of Supervision ("OSUP") because it was unable to obtain a travel document to Iran. Hammer Decl. ¶¶ 9-10. As a condition of Petitioner's OSUP release, U.S. Enforcement and Removal Operations ("ERO") required Petitioner to appear for regular check-ins. Since his release, Petitioner has consistently appeared for these check-ins. Hammer Decl. ¶ 10. At the time of Petitioner's arrest on June 24, 2025, he had an upcoming check-in with ERO scheduled for July 7, 2025. Purcell Decl. I ¶ 4.

As an additional condition, OSUP release requires that supervised noncitizens do not commit any crimes. Hammer Decl. ¶ 11. Following his release from ICE detention in 2006,

Petitioner was arrested twelve times for various offenses. Hammer Decl. ¶ 12. In 2010, a jury found Petitioner guilty of unlawful distribution of a controlled substance to a minor, possession of cocaine, attempted sexual abuse in the second degree, sexual abuse in the third degree, and driving under the influence of intoxicants ("DUII"). Resp't's Evid. Ex. 206, 1. ECF No. 25-5. In 2013, the Oregon Court of Appeals reversed all convictions except the DUII, finding that the trial court failed to cure prejudicial remarks regarding nationality and religion made by the prosecution. Resp't's Evid. Ex. 206. Before 2022, Petitioner's convictions included driving under the influence, driving without a license, and aggravated theft in the first degree. Hammer Decl. ¶ 12. In December 2022, Petitioner was arrested and subsequently convicted for aggravated theft in the first degree. Hammer Decl. ¶ 12. This was Petitioner's most recent conviction, for which he was sentenced to five years of probation. Hammer Decl. ¶ 12.

## II.    Petitioner's Conversion to Christianity and Current Conditions in Iran

Petitioner initially converted to Christianity in 2012 and increased his participation in the Apostolic Pentecostal Christian Church in 2021. Evid. Tr. 35:4-17. Petitioner's pastor initially took note of Petitioner's church attendance in September of 2021. Evid. Tr. 40:9-41:2. Petitioner's pastor observed Petitioner regularly volunteering at the church, hosting bible studies in his home, and sharing his spiritual testimony with others, in accordance with the beliefs of the church. Evid. Tr. 40:21-41:16.

In Iran, conversion from Islam to Christianity is a crime punishable by serious criminal penalties, including death. Br. Supp. TRO Ex. 4 ("Religious Freedom Report"), 1-4, ECF No. 11. The U.S. State Department published identified human rights risks in Iran, explaining that "[p]revailing [Iranian legal opinions] prescribe the death penalty for apostasy" and "[spreading]

of religions other than Islam carries a punishment of up to 10 years in prison."[1] Religious Freedom Report, 1. Additionally, the U.S. State Department published a travel advisory, warning against any travel to Iran. Ex. Mot. TRO ("Travel Advisory") 1-2, ECF No. 17. Both U.S. nationals and dual U.S.-Iranian nationals have been kidnapped and wrongfully arrested in Iran without warning or any evidence that they committed crimes. Travel Advisory 1.

### III. Petitioner's Detention and Petition for Writ of Habeas Corpus

On June 22, 2025, the United States bombed Iranian nuclear production facilities.[2] Approximately 48 hours later, on the morning of June 24, 2025, ICE arrested Petitioner as he was going to his gym. Purcell Decl. I ¶ 2. ICE initially held Petitioner at the ICE facility in Portland, Oregon, Purcell Decl. I ¶¶ 2-3, before transporting Petitioner to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Hammer Decl. ¶ 16. Petitioner filed his petition for a writ of habeas corpus the same day. Pet. for Writ of Habeas Corpus, ECF No. 1.

In an expedited hearing on the same day of Petitioner's arrest, this Court entered an order prohibiting Respondents from moving Petitioner outside of the Western District of Washington or the District of Oregon without advance notice of the intended move. ECF No. 6. On July 21, 2025, this Court granted preliminary injunctive relief and ordered that Respondents shall not remove Petitioner from the United States prior to this Court's ruling on Petitioner's petition for a writ of habeas corpus. ECF No. 18. On September 15, 2025, Petitioner filed a motion to reopen

---

[1] Apostasy refers to the renunciation of a religious faith. *Apostasy*, Webster's Third New International Dictionary (2002).
[2] *Coultas v. Payne*, No. 3:11-cv-45-AC, 2015 WL 5920645, at *3 (D. Or. Oct. 9, 2015) ("The court may 'take judicial notice of undisputed matters of public record . . . including documents on file in federal or state courts.'") (quoting *Harris v. County of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012)). The Court takes judicial notice of the United States's recent bombing in Iran because this fact is undisputed and a matter of public record. *See* Br. Supp. TRO Ex. 1 ("NYT Article"), 2-4, ECF No. 11.

his removal order with the BIA. Decl. Supp. Reply Brief ("Purcell Decl. II") ¶¶ 2-3, ECF No. 31. Currently, Petitioner remains detained at NWIPC in Tacoma. Hammer Decl. 4:16.

At the time of Respondents' initial response to the petition for writ of habeas corpus, in June 2025, ICE was assessing the potential for removing Petitioner to a third country. Hammer Decl. 4, ¶ 15. As of September 9, 2025, Respondents represented that they were no longer assessing or pursuing the potential for removing Petitioner to a third country. Rodriguez Decl. ¶ 4, ECF No. 29. ICE also represented that Petitioner "could be a candidate" for a charter removal flight to Iran, scheduled for the first week in October of 2025. Rodriguez Decl. ¶ 5. ICE's request for a travel document to deport Petitioner to Iran is pending, though ICE has not yet determined whether the travel document will be issued or required. Rodriguez Decl. ¶¶ 4-5.

## DISCUSSION

Federal courts have jurisdiction over petitions for writs of habeas corpus filed by persons "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Petitioner here alleges he is being held unlawfully. Respondents contend that this Court lacks jurisdiction over Petitioner's claim because he challenges his final order of removal rather than his detention. Respondents also argue that Petitioner's detention is lawful.

**I.    Jurisdiction**

"Habeas has traditionally been a means to secure *release* from unlawful detention" not "to obtain additional . . . review" and "ultimately . . . authorization to stay in this country." *Dep't Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020). Federal statutes proscribe individuals from challenging an order of removal in district courts through a habeas petition. *Singh v. Gonzales*, 499 F.3d 969, 976-77 (9th Cir. 2007); 8 U.S.C. § 1252(b)(9); *see also* 8 U.S.C. § 1252(a)(5) ("[A] petition for review filed with an appropriate Court of Appeals . . . shall be the sole and exclusive means for judicial review of an order of removal . . . ."). Federal law

also prevents judicial review of the executive branch's "'decision or action' to *commence* proceedings, *adjudicate* cases, or *execute* removal orders." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g)). Nor can an individual invoke habeas jurisdiction to stay an order of removal until the BIA resolves his motion to reopen. *Rauda v. Jennings*, 55 F.4th 773, 777, 779 (9th Cir. 2022). Nevertheless, habeas remains the "basic method for obtaining review of continued custody after a deportation order [has] become final." *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001).

Respondents argue that this Court lacks jurisdiction to release Petitioner from detention or review the execution of his final order of removal. Respondents argue that Petitioner uses his habeas petition to stall the execution of his final order of removal rather than seek review of continued custody. Petitioner has advanced several arguments in support of the writ for habeas corpus, including that Respondents cannot detain Petitioner without a reasonable opportunity to file a motion to reopen. The core of Petitioner's claim, however, is that his detention is unlawful because there is no significant likelihood he will be removed in the reasonably foreseeable future. Because Petitioner seeks review of his continued custody and his removal order is final, the Court has jurisdiction over his petition.

## II.     Due Process

The Due Process clause prohibits deprivations of life, liberty, and property without due process of law. U.S. Const. amend. V. The Supreme Court recently reaffirmed that these protections extend to noncitizens in the United States. *See Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (internal quotation marks and citation omitted)). The law "does not permit indefinite detention" of a noncitizen subject to a final order of removal. *Zadvydas*, 533 U.S. at 689.

In *Zadvydas*, the Supreme Court held that detention awaiting removal is presumptively reasonable for up to six months. *Id.* at 701. The six-month presumption "does not mean that every alien not removed must be released after six months." *Id.* Instead, after six months of detention, a noncitizen may seek his release from detention by showing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* Once a noncitizen has shown this, the burden shifts to the government, which "must respond with evidence sufficient to rebut that showing." *Id.*

### A.    Presumption of Reasonable Detention

Respondents do not argue that Petitioner's re-detention is presumptively reasonable because the duration of his second detention is less than six months. Still, federal courts have refrained from applying the presumption of reasonableness under *Zadvydas* in re-detention cases like this one. *See, e.g.*, *Phong Thanh Nguyen v. Scott*, No. 25-cv-01389, 2025 WL 2419288, at *13 (W.D. Wash. Aug. 21, 2025) ("[T]he six-month period does not reset when the government detains a[ ] [noncitizen] . . . , releases him from detention, and then re-detains him again.") (citation omitted); *Dong Van Nguyen v. Hyde*, No. 25-cv-11470, 2025 WL 1725791, at *3 (D. Mass. June 20, 2025); *Escalante v. Noem*, No. 9:25-CV-00182, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025); *Zavvar v. Scott*, No. 25-2104, 2025 WL 2592543, at *6 (D. Md. Sep. 8, 2025). Regardless, Respondents concede that Petitioner's detention should be measured cumulatively; it is "past the presumptive 180-day threshold of presumptive reasonableness." Resp't's Resp. Br. 16, ECF No. 28. The Court therefore turns to whether Petitioner has shown good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future.

### B. Respondents' Inability to Effectuate Removal in Nearly Twenty Years

First, Petitioner contends there is no significant likelihood of removal in the reasonably foreseeable future because Respondents have not successfully removed Petitioner in the nearly twenty years since an immigration judge issued his final order of removal. Respondents acknowledge ICE's previous failure to obtain a travel document to Iran, as well as the lack of removal attempts in the period since Petitioner was placed on supervised release. Nearly twenty years have passed since the issuance of Petitioner's removal order. This delay illustrates either unsuccessful or unexercised removal actions taken by Respondents and weighs against likely removal in the reasonably foreseeable future.

### C. Current Relations Between the United States and Iran

Second, Petitioner contends there is no significant likelihood of removal in the reasonably foreseeable future due to a suspected unwillingness of Iran to cooperate with the United States following the recent bombing on Iranian facilities. Respondents argue that the bombing has no bearing on the likelihood of removal. The Court disagrees. Courts may not rely "solely upon the absence of an extant or pending repatriation agreement without giving due weight to the likelihood of successful future negotiations." *Zadvydas*, 533 U.S. at 702 (internal quotes omitted). Here, because Respondents have yet to obtain a travel document for Petitioner's removal to Iran, this Court may not solely rely on the absence of a travel document but instead must contemplate the likelihood of successful future negotiations with Iran. Respondents have put forth no evidence to support the likelihood of successful future negotiations to rebut Petitioner's good reason to believe that Iran will be unwilling to cooperate with Respondents' plan for removal. If Respondents have relied upon some assurance of Iran's willingness to accept Petitioner on a scheduled charter flight, they have failed to present any evidence to this Court.

### D. Respondents' Potential Charter Flight for Petitioner

Respondents additionally argue that because Petitioner "could be a candidate" for the scheduled charter flight to Iran, they have met their burden. Rodriguez Decl. ¶ 5. The standard for lawful continued detention is not that the government simply continue "good faith efforts to effectuate [removal]," nor that a noncitizen must show that removal is impossible. *Zadvydas*, 533 U.S. at 702 (internal quotations omitted). Such a standard would "require an alien seeking release to show the absence of *any* prospect of removal—no matter how unlikely or unforeseeable." *Id.* Here, Respondents rely on the mere possibility of a scheduled charter flight to Iran in lieu of a travel document, the possibility of future successful negotiations, or the possibility of third country removal. These contentions are speculative and are insufficient to rebut Petitioner's showing that removal is not significantly likely within the reasonably foreseeable future.

### E. Measuring Reasonableness to Assure Petitioner's Presence for Removal

Lastly, Respondents argue that this Court "should measure reasonableness primarily in terms of the statutes basic purpose, namely, assuring the alien's presence at the moment of removal." *Id.* at 699. While this Court agrees with assessing reasonableness in accordance with the statutory purpose of assuring Petitioner's presence for removal, it is not persuaded that continued detention is required to assure Petitioner will be present for removal. Petitioner has strong ties to his community in Oregon. He shares a home with his spouse, children, and mother. Evid. Tr. 24:6-21. He participates in regular social and volunteer events with his church. Evid. Tr. 40:21-41:16. For nearly two decades, Petitioner consistently attended his regular check-ins with ERO. Hammer Decl. ¶ 10. Accordingly, the Court finds that Respondents' have not provided evidence sufficient to rebut Petitioner's showing that there is no significant likelihood of removal in the reasonably foreseeable future.

**CONCLUSION**

For the reasons above, the Petitioner's Petition for Writ of Habeas Corpus (ECF No. 1) is GRANTED. Respondents and all their officers, agents, employees, attorneys, and persons acting on their behalf or in concert with them ARE ORDERED to immediately release Petitioner S.F. from custody under the conditions of his most recent order of supervision.

DATED this 7th day of October 2025.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (he/him)
United States District Judge